UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

Dtex, LLC,

                         Plaintiff,

        v.

BBVA Bancomer, S.A.,

                         Defendant.

C/A No. 7:04-2273-13

ORDER
(Written Opinion)

This matter is before the Court on Defendant's Motion to Dismiss.  Plaintiff,

Dtex, Inc., a South Carolina corporation, brings this action against Defendant, BBVA

Bancomer, S.A. ("Bancomer"), a financial institution headquartered in Mexico, seeking

damages under South Carolina common law and treble damages under the Racketeering

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.  For the

reasons set forth below, the Court grants Defendant's motion to dismiss Plaintiff's

claims under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction

and under Federal Rule of Civil Procedure 12(b)(6) for failure to plead a valid RICO

claim.

I. BACKGROUND

On July 13, 2004, Plaintiff filed its complaint against Defendant, asserting

tortious interference with contract, intentional interference with prospective contractual

relations, unfair and deceptive trade practices, and conversion.  Defendant filed a timely

motion to dismiss the complaint on October 5, 2004 pursuant to Federal Rule of Civil

1

Procedure 12(b)(2) for lack of personal jurisdiction, the doctrine of *res judicata*, the doctrine of prior pending action, and the doctrine of *forum non conveniens*.  Plaintiff then moved on November 1, 2004 to amend the complaint, and Defendant filed the instant motion to dismiss the amended complaint on December 30, 2004.   The amended complaint adds factual allegations to Plaintiff's contention that this Court has *in personam* jurisdiction over Defendant (specifically making alter ego allegations), and it also asserts a RICO claim, thereby seeking to come under 18 U.S.C. § 1965, RICO's nationwide service of process provision.

Plaintiff's claims arise from a dispute over certain factory equipment located in Chihuahua, Mexico and formerly owned by a Mexican corporation, Denimtex, S.A. de C.V. (the "Equipment").  Defendant avers that it loaned approximately $30 million to Denimtex in Mexico and that it holds a first priority lien over the Equipment.  Plaintiff alleges that it obtained rights to the Equipment following Denimtex's default on the loans by entering a successful bid for the Equipment in an auction conducted in Mexico by the Mexican Labor Court on July 5, 2002.  The parties have been litigating their dispute in Mexico, first in the Mexican Labor Court and later in the Federal District Court, Federal Circuit Court (Labor Division), and Bankruptcy Court.

Plaintiff seeks to establish personal jurisdiction in this Court by alleging that Defendant is doing business in South Carolina both directly and through its independent subsidiary, Bancomer Transfer Services, Inc. ("BTS"), which is headquartered in Texas. The Court granted Plaintiff nearly a full year of exhaustive jurisdictional discovery to

2

test its theories of personal jurisdiction, which depend upon certain international wire transfers, money transfers, U.S. banking registrations, and U.S. trademarks related to Defendant. Without conceding personal jurisdiction, Defendant allowed Plaintiff to depose representatives of its Mexico City office and Houston agency (which is similar to a bank branch but does not accept deposits). Although BTS is not a party to this action and has not submitted to personal jurisdiction in this Court, it also voluntarily produced a representative for a deposition in Texas. Plaintiff also served dozens of interrogatories and received over 2,500 documents in response to its document requests. In short, the record reflects that Plaintiff had a full and fair opportunity to test its theories of personal jurisdiction through discovery.

The gravamen of Plaintiff's complaint is that Defendant engaged in a course of criminal and corrupt practices to prevent Plaintiff from obtaining possession of the Equipment, which it purchased and paid for in Mexico. Plaintiff claims that Defendant's ultimate purpose is to extort money from Plaintiff in exchange for allowing Plaintiff to conduct its business in Mexico. [Am. Cplt. ¶ 22]. Plaintiff's allegations are wide-ranging, but the Court will summarize them here based on its own review of the amended complaint.

According to the amended complaint, Defendant has made numerous false and fraudulent misrepresentations to the Mexican Labor Board and to various Mexican courts during the pendency of the Mexican proceedings. [Am. Cplt. ¶¶ 43, 56, 60, 61, 62, 63, 75, 85, 88, 90, 93, 107]. The amended complaint further alleges that

3

Defendant and its agents illegally denied Plaintiff access to the Equipment [Am. Cplt. ¶¶71-72], although Plaintiff was later able to take possession of the Equipment. [Am. Cplt. ¶ 80]. Plaintiff also claims that Defendant hired "thugs" to attempt to force entry into the facility where the Equipment is stored and has posted people outside the Equipment site to prevent Plaintiff from moving the Equipment. [Am. Cplt. ¶¶100, 105]. Finally, Plaintiff claims that Defendant has filed fraudulent criminal charges against its representatives that have caused those representatives to fear traveling to Mexico and has sought arrest warrants against Plaintiff's Mexican attorney. [Am. Cplt. ¶¶ 112, 119].

At oral argument on Defendant's motion to dismiss, the Court instructed Plaintiff to submit a RICO case statement, as required by Order of the Chief Judge of this District, explaining how the allegations in its amended complaint satisfied the statutory pleading requirements for RICO claims. Plaintiff used the case statement as an opportunity to supplement its amended complaint with additional factual allegations and legal theories. Thus, through Plaintiff's complaint, amended complaint, and RICO case statement, Plaintiff has had three opportunities to clarify and refine its claims against Defendant.

## II. DISCUSSION

Defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(6) solely for failure to state a claim under RICO,

4

and the doctrines of *res judicata*, prior pending action, and *forum non conveniens*.[1]

"When a court's personal jurisdiction is properly challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the jurisdictional question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Labs., Inc. v. Azko, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). Under Rule 12(b)(6), "a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

A.    *Specific and General Personal Jurisdiction*

Defendant contends that Plaintiff has not satisfied its burden to establish that Defendant, a Mexican corporation, is subject to personal jurisdiction in this Court. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178 (1936) (plaintiff bears burden of proof for personal jurisdiction). Personal jurisdiction exists where a defendant has "minimum contacts" with the forum "such that . . . maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 942 (4th Cir. 1994) (citing *Int'l Shoe Co. v.*

---

[1]In light of the Court's holdings on Defendant's Rule 12(b)(2) and Rule 12(b)(6) arguments, the Court need not reach the issues of *res judicata*, prior pending action, or *forum non conveniens*.

*Washington*, 326 U.S. 310, 316 (1945)).  To meet this burden, Plaintiff must demonstrate that Defendant is subject to either specific or general jurisdiction in South Carolina.

Specific jurisdiction exists where a "defendant's contacts with the forum state provide the basis for the suit." *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004). Plaintiff effectively concedes that specific jurisdiction does not lie here because the amended complaint contains no suggestion that Defendant's alleged business contacts in the United States bear any connection to the parties' dispute, which involves allegations of conduct that occurred solely in Mexico.

To establish general jurisdiction, Plaintiff must show that Defendant has purposefully established "'continuous and systematic'" contacts in the forum state. *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 213 (4th Cir. 2002) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)); see also *Lesnick*, 35 F.3d at 943 (defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum state") (internal quotation marks and citation omitted).  Due process precludes a finding of general jurisdiction absent a showing that Defendant is "domiciled in, organized under the laws of, doing business, or maintaining . . . its principal place of business in this State" or otherwise has an "enduring relationship" with South Carolina. *Brown v. Geha-Werke GmbH*, 69 F. Supp. 2d 770, 779 (D.S.C. 1999) (internal quotation marks and citation omitted).

Plaintiff has not sustained its burden of demonstrating that Defendant maintains the continuous and systematic presence necessary to satisfy the due process requirements for general jurisdiction in this forum.  As Plaintiff concedes, Defendant is a Mexican bank with its principal place of business in Mexico City, Mexico. Defendant maintains no branch offices or other facilities in South Carolina; has no employees, agents, or other representatives in South Carolina; is not licensed to do business in South Carolina and does not, in fact, do business in South Carolina; has never filed or been required to pay South Carolina taxes; does not conduct advertising in South Carolina or maintain business relationships of any kind with South Carolina residents; and has no bank accounts or assets in South Carolina.  In short, Defendant simply does not maintain the "continuous and systematic" business presence in South Carolina that is required for general jurisdiction in this Court.  *Base Metal*, 283 F.3d at 213 (internal quotation marks and citation omitted); *see also Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993) (no general jurisdiction in Maryland for a company that employed fourteen Maryland residents, stored property in Maryland, maintained a contract with a Maryland entity, held regular meetings in Maryland, and processed millions of dollars of annual sales in Maryland); *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 415 (4th Cir. 2002) (no personal jurisdiction because "[a]ppellees have no offices, agents, or employees in South Carolina[,] . . . do not advertise in South Carolina," and because "attenuated contacts with [the] forum state are insufficient").

Plaintiff asserts that the Court may exercise general jurisdiction over Defendant

based on the fact that Defendant, like every other sophisticated bank, wires funds from customers' accounts in Mexico to banks in South Carolina at customer' requests and receives wire transfers from banks in South Carolina sent to customers' bank accounts at Bancomer in Mexico.  Between 2000 and 2004, Defendant sent 658 wire transfers to South Carolina banks at the request and on behalf of its customers from their bank accounts in Mexico and received in Mexico 408 wire transfers from South Carolina banks for deposit in customer accounts.   As federal courts have held on many occasions, such customer-initiated bank-to-bank wire transfers do not establish the "continuous and systematic" purposeful presence necessary to establish personal jurisdiction over a foreign bank.  *See, e.g., Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1299 (10th Cir. 1999) (personal jurisdiction lacking because a foreign defendant could not "expect to be haled into court" in the forum based on wire transfers); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 764 (S.D.N.Y. 2004) ("[T]he norm of 'fundamentals of substantial justice' does not accord with a finding of minimum contacts where a non-resident bank engages in wire transfers or cash withdrawals on behalf of its clients as part of the financial process.") (quoting *Baptichon v. Nev. State Bank*, 304 F. Supp. 2d 451, 462 (E.D.N.Y. 2004)); *United Fin. Mortgage Corp. v. Bayshores Funding Corp.*, 245 F. Supp. 2d 884, 894 (N.D. Ill. 2002) (citing cases where "wire transfers . . . were not enough to establish minimum contacts"); *Resolution Trust Corp. v. First of Am. Bank*, 796 F. Supp. 1333, 1336-37 (C.D. Cal. 1992) ("Jurisdiction has been declined in instances of . . . dealings

8

between banks through wire transfers or similar contacts."). Defendant's non-purposive role in wire transfers from customer accounts to accounts at banks in South Carolina and throughout the world falls far short of the more extensive contacts that federal courts have found sufficient for general jurisdiction. *See, e.g., ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 624 (4th Cir. 1997).

Plaintiff's reliance upon *Provident National Bank v. California Federal Savings & Loan Ass'n*, 819 F.2d 434 (3d Cir. 1987), is unavailing.[2]   Unlike the present case, *Provident* involved a California bank that maintained its own account with a bank in Pennsylvania and wired money to that bank account "every business day" in order to process checks through the Pennsylvania bank. *Id*. at 438.  The Third Circuit's holding that the defendant bank was subject to personal jurisdiction in Pennsylvania reflected the defendant's continuous maintenance of a bank account in the forum, the fact that the funds transferred to and maintained in the forum apparently belonged to the bank, and the regularity and purposefulness of the bank's activity. *See id.*  None of these factors are present in this case, and Plaintiff has not shown that the customer-initiated wire transfers processed by Defendant otherwise give Defendant a "continuous and systematic" presence in South Carolina.

For essentially the same reasons, Defendant's acceptance of international money transfers from BTS for distribution to individuals in Mexico does not constitute the type

---

[2]Following the September 29, 2005 hearing on Defendant's motion to dismiss and pursuant to this Court's directive, Plaintiff identified *Provident* as its "best case" on personal jurisdiction.

9

of purposeful activity for which Defendant should "expect to be haled into court" in South Carolina. *Soma Med. Int'l*, 196 F.3d at 1299.  Money transfers are functionally similar to wire transfers, except that customers may initiate money transfers not only from banks but also from a variety of retail chains and other independent money transmitters.  These banks and independent money transmitters forward customer funds from locations throughout the United States and Canada to their corporate headquarters or operations centers (none of which are located in South Carolina) and then relay the funds to other companies, which provide for distribution in the destination country.  For money transfers to Mexico, certain money transmitters enlist the services of Defendant's independent Texas subsidiary, BTS.  BTS converts the funds into Mexican pesos and, pursuant to a separate contract with Defendant, instructs Defendant to dispense the Mexican pesos to the designated payees in Mexico.  Defendant does not have any contact or contractual relationship with the independent money transmitters' customers or, indeed, with the money transmitters themselves.[3]  As a payout bank, Defendant's only role is to dispense pesos in Mexico pursuant to its contract with BTS.  In light of this limited role, Defendant cannot be said to have purposefully availed itself of South Carolina jurisdiction.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (observing that the "'purposeful availment'

---

[3]Until October 2004, Bancomer was a nominal party to BTS's contract with the United States Postal Service ("USPS") for the DineroSeguro money transfer program, but Bancomer's sole role under the USPS contract was to serve as a payout bank in Mexico for DineroSeguro money transfers, the same limited role it plays for all money transfers.  BTS routed only nine small money transfers to Bancomer under the DineroSeguro program between 2000 and 2004 involving persons who provided South Carolina addresses, and two of these transfers were cancelled prior to distribution in Mexico.

requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts") (citations omitted).

Plaintiff emphasizes that, between 2000 and 2004, Defendant received hundreds of thousands of money transfers, involving hundreds of millions of dollars, that originated from South Carolina residents for which Defendant earned millions of dollars in fees from BTS. The test for general jurisdiction, however, is whether the defendant bank purposefully directed its activities at the forum such that it established "continuous and substantial general business contacts" there. *ESAB Group, Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 329 (D.S.C. 1999) (internal quotation marks omitted); *see also Resolution Trust Corp.*, 796 F. Supp. at 1336 ("[T]here is no jurisdiction [over a bank] absent an act to purposefully avail itself of the [forum] market."). By accepting pesos from BTS, which is located in Texas, for distribution to money transfer recipients in Mexico, Defendant has no more established a "continuous and substantial" presence in South Carolina than it has by accepting wire transfers or cashing checks from South Carolina banks. *See Resolution Trust Corp.*, 796 F. Supp. at 1336-37 (holding that "wire transfers or similar contacts" are insufficient to create personal jurisdiction); *United Fin. Mortgage Corp.*, 245 F. Supp. 2d at 894 (transactions such as wire transfers that are "fortuitous" rather than purposeful are insufficient); *Daventree Ltd.*, 349 F. Supp. 2d at 764 (mere "wire transfers or cash withdrawals" are insufficient for personal jurisdiction).

Defendant's federal regulatory applications and trademarks are also insufficient

11

to establish personal jurisdiction in this forum.  Although Defendant filed a "Consent to Jurisdiction" form with the Federal Reserve when it opened its Texas agency, this form applies only to enforcement actions by federal regulators; it does not constitute a general waiver of personal jurisdiction defenses for private lawsuits.  Similarly, Defendant has not waived its personal jurisdiction defenses or established "continuous and systematic general business contacts" with South Carolina by obtaining U.S. trademarks.  *ESAB Group, Inc.*, 34 F. Supp. 2d at 329 (internal quotation marks omitted).  Neither of these federal filings gives Defendant a continuous and systematic presence in South Carolina.

In the alternative, Plaintiff asserts that this Court may exercise personal jurisdiction over Defendant through BTS, Defendant's wholly owned subsidiary, but Plaintiff has not pleaded or demonstrated an adequate basis to pierce the corporate veil between the companies.  *See DeWitt Truck Brokers, Inc. v. W. Roy Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976) (plaintiff bears burden for establishing grounds to pierce the corporate veil).  Plaintiff argues that veil-piercing is warranted here because BTS is alternatively Defendant's "alter ego" or de facto "agent or department." Under each of these theories, however, Plaintiff must show that Defendant exerts undue control over BTS or otherwise circumvents corporate formalities, and Plaintiff presents no such evidence here.  *See Mylan Labs.*, 2 F.3d at 63-65 (declining jurisdiction where plaintiff did not prove that the defendant violated corporate formalities or exercised undue control over a subsidiary); *Hammond v. Honda Motor*

*Co.*, 128 F.R.D. 638, 643 (D.S.C. 1989) (critical inquiry is "the amount of control and supervision exercised by one entity over another").  Instead, Defendant and BTS have distinct corporate structures, are financially independent, and respect corporate formalities.[4]  The mere fact that BTS operates a money transfer business in Texas and contracts with the Defendant, its parent company, to serve as one of its foreign payout banks is insufficient to justify veil-piercing, because Plaintiff has not produced any evidence of impermissible domination, control, or abuse of the corporate form.  *See Gray v. Riso Kagaku Corp.*, No. 95-1741, 1996 WL 181488, at *3 (4th Cir. Apr. 17, 1996) (per curiam) (foreign company not subject to jurisdiction in South Carolina even though its wholly owned subsidiary conducts marketing on its behalf in South Carolina).

Even if the Court could pierce the corporate veil between Defendant and BTS here, Plaintiff would gain no advantage because Plaintiff has not shown that BTS is subject to personal jurisdiction in South Carolina.  BTS does not maintain offices, representatives, bank accounts, or any other contacts with South Carolina.  BTS may have contracted to perform certain services for independent money transmitters

---

[4]Since Defendant does not disregard corporate formalities with BTS, it is irrelevant that some of BTS's directors have been officers or directors of Defendant, that BTS gives Defendant periodic updates on its financial performance and other issues, that Defendant consolidates BTS's disclosures into its own financial statements, that BTS maintains an unused line of credit with Defendant as security for money transfers, and that the companies have shared certain trademarks and logos in marketing materials. *See Weiss v. La Suisse*, 69 F. Supp. 2d 449, 458 (S.D.N.Y. 1999) ("[O]verlap of directors and officers between parent and subsidiary alone does not render the subsidiary a 'mere department' for jurisdictional purposes.") (citation omitted); *Builder Mart of Am., Inc. v. First Union Corp.*, 563 S.E.2d 352, 358-59 (S.C. Ct. App. 2002) (holding that "unified marketing and advertising and holding out to the public as a single entity" are "insufficient to confer jurisdiction"), *overruled on other grounds in Farmer v. Monsanto Corp.*, 579 S.E.2d 325 (S.C. 2003).

headquartered outside South Carolina, but it has no such contacts with any South Carolina individual or entity.  BTS's website, which lists South Carolina as one of thirteen "Permitted Origination States," does not constitute a "continuous and systematic" presence in South Carolina.  The website's terms and conditions expressly provide that "[e]ach person visiting [the] Website or using the Website Service agrees to the exclusive jurisdiction of the courts within New York," and there is no evidence that the site has ever serviced a South Carolina resident.  *See ESAB Group, Inc.*, 34 F. Supp. 2d at 330-31 ("[T]he critical issue for the court to analyze is the nature and quality of the commercial activity *actually conducted* by an entity over the Internet in the forum state.") (emphasis added).

The common denominator of Plaintiff's various jurisdictional arguments is that each would violate "traditional notions of fair play and substantial justice" by expanding general jurisdiction far beyond the limits of due process.  *Int'l Shoe Co.*, 326 U.S. at 316 (citation omitted); *see also Lesnick*, 35 F.3d at 945 (holding that where the continuous and substantial presence "test is met, a court must still determine whether the exercise of such jurisdiction would offend traditional notions of fair play and substantial justice").  For this Court to exercise personal jurisdiction over a foreign bank based on international wire transfers, money transfers, trademarks, or federal banking licenses would violate banks' reasonable expectations and unreasonably subject virtually every bank throughout the world to general jurisdiction in South Carolina-regardless of whether the bank maintained a "continuous and systematic"

14

presence in the state. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980) (defendant's "conduct and connection with the forum [must be] such that [it] should reasonably anticipate being haled into court there"); *Plymouth Capital Ltd. v. Three S Farms, Inc.*, No. 97 C 7740, 1998 WL 242154, at *3 (N.D. Ill. May 6, 1998) ("Finding jurisdiction appropriate because [banks] accepted wire transfers from a company or bank in another state would potentially subject [banks] to jurisdiction in every state. . . . [and] offend traditional notions of fair play and substantial justice."); *Northpark Nat'l Bank v. Bankers Trust Co.*, 572 F. Supp. 520, 523 (S.D.N.Y. 1983) ("The assertion of jurisdiction on the basis of fees for a service over which [a bank] has no control does not comport with notions of 'substantial justice.'"); *cf. Stover v. O'Connell Assocs.*, 84 F.3d 132, 137 (4th Cir. 1996) ("To conclude that [placing telephone orders] establishes presence in a state would upset generally held expectations, and redefine the nature of state sovereignty."); *Asset Allocation & Mgmt. Co. v. W. Employers Ins. Co.*, 892 F.2d 566, 569-70 (7th Cir. 1989) (cashing checks from forum banks is insufficient for personal jurisdiction for these reasons). Furthermore, Defendant's burden to litigate in this forum would be severe, while South Carolina's interest in this dispute is slim, and the parties are in ongoing litigation involving the Equipment in Mexico. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national

15

borders."); *United States v. M/V Santa Clara I*, 859 F. Supp. 980, 990 (D.S.C. 1994) (weighing these factors in deciding whether to exercise jurisdiction). Thus, both the "continuous and substantial" presence requirement and "traditional notions of fair play and substantial justice" preclude this Court from exercising personal jurisdiction over Plaintiff's claims.

B.     *Plaintiff's RICO Claim*

To state a claim under RICO, a plaintiff must properly plead the following elements of a criminal RICO violation: (1) the defendant's employment by or association with (2) an "enterprise" (3) engaged in or affecting interstate commerce (4) the affairs of which the defendant conducts or participates in through a pattern of racketeering activity. *S.C. Elec. & Gas Co. v. Westinghouse Elec. Corp.*, 826 F. Supp. 1549, 1558 (D.S.C. 1993) (citing *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981)). In addition, the plaintiff must plead that he was injured by the defendant's RICO violation. *Id*. A "pattern of racketeering activity" requires at least two acts of "racketeering activity" committed within ten years of each other. 18 U.S.C. § 1961(5). Acts that qualify as "racketeering activity" are enumerated in 18 U.S.C. § 1961(1).

Defendant asserts that Plaintiff has not properly alleged (1) two or more predicate acts; (2) a pattern of racketeering activity; or (3) the existence of a RICO

"enterprise."[5]   For the reasons stated below, this Court agrees.  Defendant's motion to dismiss is therefore granted.[6]

1.    Two or More Predicate Acts

In opposing Defendant's motion to dismiss, Plaintiff claims that it is relying only on extortion-related predicate acts under the Hobbs Act, 18 U.S.C. § 1951.  In its RICO Case Statement, Plaintiff added references to theft under 18 U.S.C. § 659.  However, the Court finds this case involves allegations of one alleged "scheme" relating to one set of Equipment.   Whether the allegations are characterized as "extortion" or "theft," the amended complaint alleges at best one attempted predicate act.

Plaintiff's claims that Defendant engaged in multiple acts of extortion and attempted extortion are improper attempts to separate multiple acts in furtherance of the same alleged scheme into multiple predicate acts.  In *American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir.), cert. denied, 125 S. Ct. 479 (2004), the plaintiff alleged that the defendant committed mail fraud, wire fraud, and extortion by limiting insurance reimbursements to several chiropractors.  The Fourth Circuit held that the complaint failed to state a claim for mail fraud or wire fraud.  With

---

[5]Defendant also argues that RICO does not apply to the facts alleged in the complaint because the events at issue all occurred in Mexico.  The Court need not reach that issue because it grants Defendant's motion to dismiss on other grounds.

[6]Because the RICO claim must be dismissed under Rule 12(b)(6), the Court need not decided whether, if the RICO claim were properly pleaded, RICO's nationwide service of process provision would in fact confer personal jurisdiction over Defendant.

17

respect to the extortion allegations, the Court concluded that "[b]ecause we have held that [plaintiff] failed to state a claim for mail or wire fraud, it has failed to allege at least two predicate acts of racketeering, and we need not address whether it properly alleged a claim of extortion." *Id*. at 235.   Thus, even though the defendant was alleged to have committed acts of extortion against several individual chiropractors, the Court viewed those allegations as amounting to, at best, one predicate act of extortion. *See Holland v. Cole Nat'l Corp.*, No. 7:04-CV-246, 2005 WL 1242349, at *9 (W.D. Va. May 24, 2005) (construing *American Chiropractic* and noting that "in rejecting extortion as the lone predicate act, the Fourth Circuit obviously did not consider each instance of reduced reimbursement to be a separate predicate act"); *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (holding that "artificially fragmenting a singular act into multiple acts simply to invoke RICO" is impermissible); *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (complaint properly alleged only one predicate act of attempted extortion where subsequent acts were "examples of [defendant's] 'making good' on his threat" to plaintiff); *Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03 Civ. 9612 (GEL), 2004 WL 2071689, at *16 (S.D.N.Y. Sept. 16, 2004) ("[M]ultiple acts in furtherance of a single extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts.").

Many of Plaintiff's allegations relate to Defendant's use of the Mexican legal system.  Plaintiff claims that Defendant made misrepresentations to the Mexican courts

18

in furtherance of its alleged extortionate scheme.  Courts have consistently held, however, that the use of the legal system does not amount to extortion under the Hobbs Act.  *See, e.g., G-I Holdings v. Baron & Budd*, 179 F. Supp. 2d 233, 259 (S.D.N.Y. 2001) (collecting cases and holding that "[t]hreats of litigation, and even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion").[7]

## 2.  Pattern

Even if Plaintiff had pleaded two separate predicate acts, the complaint still would fail, because Plaintiff has failed to plead the necessary "continuity" to establish the required pattern that distinguishes "racketeering activity" under RICO from "garden-variety" commercial disputes.  *See Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) ("[S]imply proving two or more predicate acts is insufficient for a RICO plaintiff to succeed; instead, the RICO plaintiff must also show that the predicate acts are related and that they constitute or pose a threat of continued criminal activity.").

The Fourth Circuit has consistently held that RICO's pattern requirement is not satisfied where, as here, the alleged scheme is narrowly focused on one goal and will end when and if that goal is accomplished.  *See G.E. Inv. Private Placement Partners*

---

[7]Defendant argues that, because Plaintiff's complaint contains numerous references to "fraudulent" behavior by Defendant, the complaint must comply with Federal Rule of Civil Procedure 9(b)'s requirement that allegations of fraud be pleaded with particularity.  The Court need not decide whether Rule 9(b) applies, because it concludes that the complaint is insufficient even assuming Rule 9(b) does not apply.

*II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) ("Where the fraudulent conduct is part of the sale of a single enterprise, the fraud has a built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity."); *Al-Abood*, 217 F.3d at 238 (Although there is no "per se rule against a RICO claim involving only one victim[,] . . . the narrow focus of the scheme . . . and commonplace predicate acts . . . do not satisfy the pattern requirement."); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (allegations held not to satisfy continuity requirement where actions "were narrowly directed towards a single fraudulent goal," had only one set of victims, and took place over approximately one year).

Plaintiff relies on *Toucheque v. Price Bros.*, 5 F. Supp. 2d 341 (D. Md. 1998), in support of its argument that it has pleaded the necessary continuity. In *Toucheque*, the plaintiff alleged that the defendants had extorted money from him over a three-year period and would continue indefinitely to extort money from him and possibly others. *Id*. at 344. The court found the requisite continuity to satisfy RICO's "pattern" element, but distinguished the case from others in which the alleged schemes centered on a single, terminable goal. *Id*. at 346 ("[T]he scheme alleged here had no fixed goal which would terminate upon the occurrence of a specific event, but rather had the goal of continuing extortion of money."). Here, by contrast, the alleged scheme focused only on one set of Equipment in Mexico, and there is no indication that it would not terminate upon the final disposition of that Equipment.

3.     "Enterprise" Allegations

RICO makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Courts have routinely interpreted this provision to require two separate and distinct entities: a "person" and an "enterprise" through which that person acts.  In other words, the "enterprise" must not simply be "the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (rejecting "enterprise" allegations where plaintiff alleged that corporation was RICO "person" and corporation and its employees and agents were "enterprise").

Plaintiff alleges that Bancomer, together with its employees and agents, formed the RICO enterprise in this case.  The Second Circuit rejected identical allegations in *Riverwoods*.  30 F.3d at 344.  In arguing that the requisite "distinctness" between the "person" and the "enterprise" is present here, Plaintiff relies on *Kushner*, in which the Supreme Court held that a corporation's sole owner is distinct from the corporation itself and can therefore form a RICO enterprise with the corporation.  The Court reasoned that "[l]inguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise.'"  *Kushner*, 533 U.S. at 163.  The *Kushner* Court specifically distinguished *Riverwoods*, where, as here, the complaint

21

alleged "that a corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'" *Id*. at 164 (citing *Riverwoods*, 30 F.3d at 344). The Court noted that while "[i]t is natural to speak of a corporate employee as a 'person employed by' the corporation[,] . . . [i]t is less natural to speak of a corporation as 'employed by' or 'associated with'" the "oddly constructed entity" consisting of itself and its employees and agents. *Id*.

This Court agrees with Defendant that Plaintiff's amended complaint fails to allege the requisite "distinctness" between the "person" and the "enterprise." This case is not like *Kushner*, where there was an identifiable "person" who was "employed by" the enterprise. Instead, this case is like *Riverwoods*; the so-called "enterprise" cannot logically be separated from the "person." *See City of N.Y. v. Cyco.net, Inc.*, 383 F. Supp. 2d 526, 547-49 (S.D.N.Y. 2005) (relying on *Kushner* Court's citation of *Riverwoods* in granting motion to dismiss RICO complaint). Plaintiff claims that its references to so-called "outside" members of the "enterprise" save its claim, but all of those "outside" members are alleged to have been acting as Bancomer's agents. Thus, the complaint fails the "enterprise" element of RICO and must be dismissed for that reason as well.[8]

---

[8]In its RICO Case Statement, filed after the motion to dismiss had been fully briefed and argued, Plaintiff introduced its "second RICO theory" - that plaintiff itself was the RICO enterprise, and that Defendant engaged in an "attempted takeover" of Plaintiff. [RICO Case Statement at 14-15.] Even assuming this Court could consider a new theory nowhere mentioned in the amended complaint, Plaintiff does not allege that Defendant ever exercised any control over Plaintiff's affairs. The Supreme Court has interpreted the "conduct or participate" requirement to extend liability only to those "who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (emphasis added); *see also Kushner*, 533 U.S. at 158 ("[L]iability 'depends on showing that the defendants conducted or participated in the conduct of the

*    *    *

Based on the above analysis, Plaintiff's RICO claim must be dismissed under Rule 12(b)(6).  RICO's nationwide service of process provision therefore cannot provide a basis for personal jurisdiction in this Court.

## IV. CONCLUSION

For the reasons set forth, it is ORDERED that Plaintiff's state law claims are DISMISSED pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of *in personam* jurisdiction over Defendant, said dismissal being without prejudice to the re-filing of said state law claims by Plaintiff in another court that does have *in personam* jurisdiction over Defendant; and it is further

ORDERED that Plaintiff's RICO claim is DISMISSED pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and

THE COURT, having now dismissed all of Plaintiff's claims in this action on the grounds set forth above, does not need to decide and therefore does not decide the further issues whether any or all of Plaintiff's state law claims should also be dismissed or otherwise disposed of pursuant to the doctrines of prior pending action, *forum non conveniens*, or *res judicata*, and it is further

ORDERED that by virtue of the holdings herein, the Order of attachment entered by this Court and filed on August 9, 2004, is hereby VACATED *ab initio* as if it had

---

enterprise's affairs, not just their own affairs.'") (quoting *Reves*, 507 U.S. at 185).  Thus, Plaintiff's failure to allege that Defendant actually exercised control over Plaintiff's affairs is fatal to Plaintiff's "second theory."

never been entered.

IT IS SO ORDERED.

G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

Anderson, South Carolina

December ___19___, 2005.

NOTICE OF RIGHT TO APPEAL

Either party has the right to appeal this Order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure. Failure to meet this deadline, as modified by Rule 4 of the Federal Rules of Appellate Procedure, will waive the right to appeal.

24